IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Chad R. Griffin,                                          :
                        Plaintiff          :        Civil Action 2:11-cv-192

        v.                                      :        Judge Graham

Michael J. Astrue,                              :        Magistrate Judge Abel
Commissioner of Social Security,
                        Defendant          :

## REPORT AND RECOMMENDATION

Plaintiff, Chad Griffin brings this action under 42 U.S.C. §§405(g) and 1383(c)(3)

for review of a final decision of the Commissioner of Social Security denying his appli-

cations for Social Security Disability and Supplemental Security Income benefits. This

matter is before the Magistrate Judge for a report and recommendation on the admin-

istrative record and the parties' merits briefs.

**Summary of Issues.** Plaintiff Griffin maintains that he is disabled due to

Intractable Epilepsy (Refracting Epilepsy) and depression. ( R. 160, 234.) Plaintiff

argues that the decision of the Commissioner denying benefits should be reversed

because:

- The administrative law judge's finding that Griffin does not have a document-
  ed severe memory impairment is not supported by substantial evidence;
- The administrative law judge erred in rejecting the opinion of treating neur-
  ologist, Dr. Moore;
- The administrative law judge committed reversible error in evaluating the im-
  pact of Plaintiff's seizures on his ability to work and in misstating the medical
  evidence in claiming that Griffin's seizures are controlled when taking his
  medication and that Griffin refused to undergo brain surgery;

- The administrative law judge failed to sustain his burden of establishing that there is other work in the national economy that Griffin can perform.

**Procedural History.** Plaintiff Griffin filed his applications for disability insurance benefits and supplemental security income on April 18, 2008, alleging that he became disabled on December 31, 2007, at age 33. ( R. 130-41, 142-45, 230.) The applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. On October 26, 2010, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified. ( R. 30-49.) A vocational expert also testified. ( R. 49-53.) On December 3, 2010, the administrative law judge issued a decision finding that Griffin was not disabled within the meaning of the Act. ( R. 11-22.) On February 14, 2011, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security. ( R. 1-5.)

**Age, Education, and Work Experience.** Griffin was born February 15, 1975. ( R. 230.) He has a "limited" eleventh grade education. ( R. 165.) Griffin previously worked as a landscaper. ( R. 161.)

**Plaintiff's Testimony.** The administrative law judge fairly summarized Griffin's testimony as follows:

> At the hearing, the claimant testified that he considers himself to be unable to work as a result of memory problems, which he attributes to a three to four year history of seizures. He stated that he continues to experience seizures despite participating in ongoing treatment for his seizures. The claimant testified that he experiences both grand mal and petite mal seizures, but that he experiences petit mal seizure most often

(approximately once per week).  He stated that he experiences a grand mal seizure once every three months.  His grand mal seizures are followed by drowsiness.  The claimant stated that his medication regimen consisted of Capro, Topamax, and Benpax.  He admitted that he has been recommended to undergo surgery for his seizures.

The claimant testified that he experiences headaches twice per week, which last "all day." He stated that he has sought emergency department treatment for a headache, but he typically is able to alleviate his headaches by sleeping.

The claimant testified that he experiences depressive symptoms resulting from his seizures.  He admitted to experiencing crying spells, irritability, difficulty concentrating, and loss of interest in activities.  He noted that he has recently began professional mental health treatment for these symptoms.

( R. 18.)

**Medical Evidence of Record.**  The administrative law judge's decision fairly sets out the relevant medical evidence of record.  This Report and Recommendation will only briefly summarize that evidence.

Ohio State University Medical Center.  Griffin presented to the emergency department on September 6, 2002 with thirst, difficulty speaking and slurred speech. (R. 388-90.)  Griffin reported a history of cardiovascular accident six years prior.  He denied any drug use except for some marijuana the night prior.  On further review of systems, he also complained of a headache, blurry vision and some nausea and vomiting.  He had three episodes of vomiting while in the emergency room.  The emergency room physician found Griffin had slurred speech with complaints of thirst and he was positive for pronator drift and sensational droop.   His motor strength appeared to be

3

weaker on the right with 4/5 muscle strength in upper and lower extremities compared to the left at 5/5. A CT scan of the brain was within normal limits. ( R. 388.) He was admitted to the neurology department after being diagnosed with a stroke.

Griffin was seen in the emergency department on November 10, 2006 after he fell off his front porch, injuring himself following a grand mal seizure. ( R. 385-87.) A CT scan of his head was normal. ( R. 387.) He was diagnosed with a seizure disorder with a laceration to his right eyebrow and discharged with a prescription for Keppra. ( R. 386.)

An MRI of the brain taken on December 13, 2006 was negative. ( R. 393.) A December 18, 2006 EEG performed while waking and sleeping was determined to be normal. ( R. 404.)

Griffin presented to the emergency room on February 17, 2007, reporting three to four seizures in the last day. ( R. 302-08.) Griffin described his seizures as "tremors, jerking, lasting 1-5 minutes." ( R. 303-04.) He noted his paresthesias felt different than usual post seizure symptoms and he was also falling more. ( R. 305.) He reported that his most recent seizures were simple partial in nature, but that he had a grand mal seizure in the past. *Id.* He reported marijuana abuse, no depression and no alcohol abuse. ( R. 304.) Nursing notes indicate that Griffin went from being calm and cooperative when he arrived to "irate" and uncooperative, refusing to lie on the bed as instructed, "Yelling. Requesting to leave." ( R. 306.)

Griffin was monitored by intensive telemetry EEG with simultaneous video in the Epilepsy Monitoring Unit from August 5, 2007 through August 9, 2007. ( R. 309-16, 323-25, 381, 400-01, 446.) While be monitored, Griffin's medication was withheld and he experienced one complex seizure starting from the left temporal lobe area of the brain and moving to the right. ( R. 310, 315.) During this seizure, he stared, fumbled with his hands, and exhibited decreased responsiveness. ( R. 381.) At discharge, Griffin's diagnosis was partial epilepsy and he was instructed to take his medication and follow up with Dr. Moore. ( R. 310.)

Griffin was admitted on January 31, 2010 for evaluation and treatment of breakthrough seizures. ( R. 514-26.) Griffin presented in a "postical" state in which he had a headache, was nauseous, tired, confused, and "very irritable to being downright rude, using swear words and everything…would apologize…and then would immediately swear again." ( R. 514.) Griffin's blood work was "consistent with someone having seizures with demargination and also a lower bicarbonate." ( R. 515.) Griffin's wife informed the doctor that he had a partial complex seizure at 10:30 a.m. that morning followed by two grand mal seizures later that day. *Id.* Griffin's wife said that he had not taken any of his antiepileptic medications during the three days prior to his hospital admission. ( R. 514, 519.) After Griffin's medications were restarted, he was seizure-free. *Id.* Griffin admitted that he had smoked marijuana on the day of admission. *Id.* The physicians felt that the seizures were the result of his medication noncompliance. ( R. 515, 520.) A CT of the brain showed no acute process.

( R. 517, 522.)  He was discharged in stable condition on February 2, 2010.  ( R. 526.)

Griffin presented to emergency room on April 27, 2010 with complaints of inter-mittent discomfort in his head for three days. The headaches were temporarily better with ibuprofen. The neurological examination was nonfocal. He was given medication, instructed to follow-up with his neurologist, and discharged.  ( R. 537-39.)

May 5, 2010 treatment notes from the OSU Comprehensive Epilepsy Center state that Griffin continued to have two complex partial seizures a week. He reports almost daily headaches. The assessment was partial epilepsy, medically intractable. Griffin was counseld about the causes of seizures.

J. Layne Moore, M.D.  Griffin first saw Dr. Moore on December 11, 2006 about his intractable seizures.  Griffin reported having intractable seizures for at least 10 years. He  reported having had "hundreds of seizures" which occurred in the morning right after waking up.  Symptoms varied and included left-sided numbness or weakness, convulsions, and decreased responsiveness.   Griffin had not had any seizures since being hospitalized the month prior.   Neurologic and motor findings were normal.  Dr. Moore's impression was partial onset seizures that primarily occur upon awakening. ( R. 383-84.)

Griffin was evaluated by Dr. Moore on August 27, 2007 after being in the Epilep-sy Monitoring Unit.  During his hospitalization, Plaintiff's medication was increased and since that time, he had "not had any problems in terms of seizures." Griffin's mental status, neurologic, and motor examinations were normal.  Dr. Moore noted he

looked "well but sad." During this visit, Griffin was extremely depressed and crying. Dr. Moore advised Griffin to continue taking Keppra and Topamax, and he added Celexa to Griffin's medication regimen. ( R. 296.)

On December 7, 2007, Dr. Moore indicated that Griffin's seizures were "well controlled as they have even been" and he had "no seizures recently on his current regimen" of Effexor, Keppra, and Topamax. Dr. Moore noted that Griffin's mood had improved and Griffin looked "much better" since his last visit. Dr. Moore's impression was that Griffin has intractable seizures, reactive depression. His seizures appear to start in the left temporal lobe, although more precise localization prior to resection is probably indicated. Dr. Moore referred Griffin to Dr. Sarkar. ( R. 297-98.)

On January 31, 2008, Dr. Moore met with Griffin and his wife to discuss their options. He told them that if Chad had not been seizure free on medications at this time, then it was unlikely he ever would be. He discussed surgical options with them. (R. 417-18.)

On March 21, 2008, Dr. Moore noted that Griffin had "failed multiple medications," and they discussed Griffin's other treatment options. Griffin reported having two to four seizures a month and double vision, dizziness, and lightheadedness. Dr. Moore noted that Griffin did not want to have resective surgery or invasive monitoring because he was afraid of complications from the procedures. Dr. Moore wanted to enroll Griffin in a drug trial for an investigational drug. ( R. 299-300.)

Dr. Moore completed a "Seizures Residual Functional Capacity Questionnaire" in November 2008. ( R. 455-59.) Dr. Moore reported that he had seen Griffin every two to three months for almost two years and he listed Griffin's diagnosis as epilepsy. Dr. Moore described Griffin's seizures as complex partial seizures, occurring one to two times per month wherein he loses consciousness and becomes confused and irritable for 15 to 30 minutes upon waking. ( R. 455, 457.) Dr. Moore indicated that Griffin does not always have warning prior to onset and his seizures do not occur at a particular time of the day or night, but "stress makes them more likely." ( R. 455-56.) As a result, according to Dr. Moore, Griffin cannot always take precautions while working to avoid injuring himself or others. ( R. 455.) Dr. Moore opined that Griffin will not experience seizures most days, but had a history of injuring himself when he did. *Id.* He related that Griffin is compliant in taking all his related medications and also experiences lethargy and headaches as a result of the side effects. ( R. 457-58.) With regard to limitations caused by the seizures, Dr. Moore opined that Griffin will likely disrupt co-workers, need closer supervision, is unable to work at any heights, cannot use power machines or operate a motor vehicle, cannot take the bus alone, has depression associated with the seizures, will need additionally unscheduled breaks during the work day whenever he has a seizure, and that he will have "good days" and "bad days." ( R. 458-59.) Dr. Moore indicates that Griffin will miss one day of work per month and is capable of "moderate" stress, although he indicated that was "just a guess." ( R. 459.)

In January 2009, Dr. Moore noted that Griffin was "still having a few seizures,"

"look[ed] better than I have seen for awhile," and appeared to have less anxiety and depression.  Dr. Moore noted that Griffin was "an outstanding candidate for resective surgery but he cannot seem to get along with the people I refer him to."  Dr. Moore indicated that similar conflicts occurred during attempts to start Griffin in drug studies. Dr. Moore talked to Griffin about being "a little bit paranoid and little bit argument- ative."  Griffin's mental status, neurologic, and motor examinations were normal.  Dr. Moore started Griffin on Lyrica to help with his seizures and anxiety.  ( R. 498-99.)

In June 2009, Dr. Moore noted that Griffin had experienced several seizures since April 2009, the last one being a couple weeks prior and characterized by tonic-clonic behavior.  His neurological examination was normal.  Dr.  Moore assessed intractable epilepsy along with diagnoses of depressive and anxiety disorders.   Dr.  Moore increased Griffin's medication.  ( R. 500-01.)

In September 2009, Griffin reported his seizures were characterized by impair- ment of consciousness.  ( R. 502.)  Dr. Moore noted that Griffin had been prescribed Lexapro and Ativan by Dr. Schumacher for his depression, but he had not taken either medication.  ( R. 502.)  His neurological examination was normal.  *Id*.  Dr.  Moore in- creased his medication.  Griffin continued to see Dr. Moore for medication management through at least June 2010.  ( R. 509-11, 528-29, 555-56, 559.)

On February 5, 2010, Dr. Moore's notes indicate Griffin had one seizure since his January 27 visit. Griffin denied being non-compliant with his seizure medications. He was said to have a history of epilepsy that was currently controlled. Dr. Moore said

Griffin had "an irrational fear of surgery but it certainly is his decision." He counseled him about the causes of epilepsy, including non-compliance, sleep deprivation, stress, fatigue and acute illness. (R. 528.)

   Robert A. Bornstein, Ph.D.   Griffin was evaluated by neuropsychologist, Dr. Bornstein on October 31, 2007, to determine if he was a candidate for surgical intervention. ( R. 347-48.) Dr. Bornstein reported that Griffin was cooperative and appeared well-motivated during the evaluation. Dr. Bornstein administered subtests of the Wechsler Adult Intelligence Scale III, Wechsler Memory Scale III, California Verbal Learning Test II, Wisconsin Card Sorting Test, literal and sematic fluency, Grooved Pegboard Test, Trail Making Test, and the Beck Depression Inventory. ( R. 347.) This testing demonstrated that Griffin's expressive vocabulary was well below average and his spatial reasoning was in the borderline normal range (10th percentile.) His "auditory working memory was moderately impaired." Dr. Bornstein noted the results "appear to represent an accurate estimate of his current level of function." *Id.* Dr. Bornstein also reported that Griffin's rate of learning was mildly to moderately impaired; his auditory attention span was mildly impaired; and his visual attention span was moderately impaired. *Id.* Dr. Bornstein further found Griffin's "ability to maintain and alternate between two mental sequences was slowed," and there was evidence of mild depression. *Id.* Dr. Bornstein concluded that the test results "demonstrate a consistent pattern of relative deficit on measures of attention and working memory, and verbal learning and memory. The pattern of performance is consistent with mild dysfunction,

maximal in the temporal region of the left cerebral hemisphere, and is consistent with his history of intractable epilepsy." ( R. 348.) Dr. Bornstein indicated that most other aspects of higher cognitive function were normal.

Atom Sarkar, M.D.  On January 31, 2008, Griffin was seen by Dr. Sarkar for a neurological surgery evaluation.  Griffin reported that he had no history of infantile or childhood seizures.  He reported that his seizures started at age 22, but he did not receive any kind of treatment until five years later.  Dr. Sarkar indicated that Griffin seemed to have a sense of his seizure onset because he sweated, became dysphoric, stared, coughed, and became unresponsive.  At the time of this evaluation, Griffin took Keppra, Topamax, and Effexor.  Griffin and his wife reported that Griffin's seizures occurred approximately twice a month, seemed to be precipitated by stress, and lasted for approximately 10 to 20 minutes, after which he would feel "wiped out."  Dr. Sarkar noted that the prospects of Griffin remaining seizure-free from his medications were very "unlikely" and suggested that he should have resective surgery which would likely provide him with freedom from seizures.  Dr. Sarkar recommended placing electrodes to determine whether Griffin's epilepsy was focal or bitemporal and noted the different treatment options.  Dr. Sarkar noted it was "very difficult" for Griffin and his family to decide on a course of action and that he was fearful of the surgery.  Dr. Sarkar felt that before Griffin be taken back to the Epilepsy Monitoring Unit for further monitoring prior to surgery, they first needed to "aggressively control his psychiatric symptoms." ( R. 375-76.)

<u>Sudhir Dubey, Psy.D.</u>  Consulting psychologist, Dr. Dubey examined Griffin in July 2008 at the request of the Bureau of Disability Determination. ( R. 349-54.)  Griffin reported that physical symptoms affect his ability to work. ( R. 350.)  Dr. Dubey reported that Griffin felt hopeless, helpless, and depressed about his situation of not being able to work.  He has an increased sense of isolation because he is afraid he will have a seizure in public. *Id.*  Griffin reported being able to care for his personal hygiene and shop for necessary items from a physical standpoint.   He is unable to manage money, balance a checkbook or pay bills on his own. ( R. 351.)  He reported symptoms consistent with a mild level of depression. ( R. 352.)  Dr. Dubey diagnosed Griffin with an adjustment disorder with a depressed mood, chronic and assigned a  Global Assessment of Functioning (GAF) score of 70. ( R. 353.)  Dr. Dubey opined that Griffin had no impairment in his abilities to relate to others and to withstand work-related stress; a mild impairment of his ability to understand, remember, and follow instructions and maintain attention, concentration, persistence, and pace to perform simple repetitive tasks. *Id.*  Dr. Dubey concluded that Griffin would be unable to manage his own funds and if awarded benefits "would need assistance managing them." *Id.*

<u>David Dietz, Ph.D./Patricia Semmelman, Ph.D.</u>  After his review of the record in July 2008, state agency psychologist, Dr. Dietz, reported that a medically determinable impairment of adjustment disorder with a depressed mood, chronic, was present, but was not severe. ( R. 356, 359.)  Dr. Dietz noted that Griffin's inability to recall numbers backwards was atypical, and "not even seen in brain injured individuals," he felt this

was due to anxiety or motivation issues. ( R. 368.) Dr. Dietz opined that Griffin was mildly limited his activities of daily living and in maintaining social functioning. ( R. 366.) Dr. Dietz did not state to what degree of functional limitation Griffin would have in maintaining concentration, persistence or pace. *Id.* In January 2009, Dr. Semmelman, another state agency psychologist, affirmed Dr. Dietz's assessment. ( R. 462.)

Kathryn Drew, M.D. In February 2009, state agency reviewing physician, Dr. Drew, noted the record showed no documented grande mal seizures in the past few years. She found Griffin's "description of his seizures is quite variable." ( R. 464.) Dr. Drew found "a number of conflicting reports in file, including whether or not the claimant can tell when he is going to have a seizure, whether there is a particular time of day they occur," and the disconnect between his reported history of seizures since age 22 and his lack of treatment until about six years ago. ( R. 468.) She opined that Griffin had no exertional limitations but should never climb ladders, ropes, or scaffolds and should avoid unprotected heights, open hazards, and driving. ( R. 465, 467.)

Access Ohio Mental Health Center. Griffin was initially evaluated by Access Ohio Mental Health Center on July 16, 2009 on referral from Dr. Moore. ( R. 472-91.) Griffin reported being depressed due to having weekly seizures, sometimes two or three per day, which caused him to be extremely tired. ( R. 479, 491.) He noted his seizures that cause him to be confused and not know who he is. ( R. 479.) Griffin reported that his brothers kept "him busy and try to get him out of the house," and he went to music concerts. ( R. 473.) He also reported becoming extremely angry and

combative when he is at the hospital after having a seizure and while at home.  *Id.*
Plaintiff was evaluated by a psychiatrist on August 24, 2009.  ( R. 492-95.)  He attended
three additional appointments at Access Ohio through January 4, 2010.  ( R. 504-11.)

Murali Chitluri, M.D., a psychiatrist at Access Ohio completed a Residual Func-
tional Capacity Questionnaire on October 13, 2010.  ( R. 562.)  Dr. Chitluri opined that
Griffin had extreme functional limitations with regard to his activities of daily living,
social functioning, maintaining concentration, persistence, or pace, and experienced  4
or more episodes of decompensation.  *Id*.

Dr. Chitluri also competed a Medical Source Statement finding Griffin was mark-
edly limited in his abilities to: understand and remember very short and simple instruc-
tions; understand and remember detailed instructions; carry out short and simple in-
structions; carry out detailed instructions; maintain attention and concentration for
extended periods; perform activities within a scheduled; maintain regular attendance
and be punctual within customary tolerances; sustain an ordinary routine without
special supervision; make simple work related decisions; complete a normal workday
and workweek without interruptions from psychologically based symptoms and to
perform at a consistent pace without an unreasonable number and length of rest per-
iods; interact appropriately with the general public; ask simple questions or request
assistance; respond appropriately to changes in the work setting; be aware of normal
hazards and take appropriate precautions; travel in unfamiliar places or to use public
transportation; and tolerate customary unskilled work pressures.  ( R. 564-65.)  Dr.

Chitluri opined that Griffin had moderate limitations in his abilities to: remember locations and work-like procedures; work in coordination with or proximity to others without being unduly distracted by them; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; set realistic goals or to make plans independently of others; and maintain personal appearance and hygiene. *Id.* Dr. Chitluri further opined that stress on any job would increase Griffin's functional limitations. (R. 565.) He also indicated that Griffin was unable to manage his own funds. *Id.*

John L. Tilley, Psy.D. Consultive psychologist, Dr. Tilley, examined Griffin on July 15, 2010. (R. 542-50.) Griffin reported to Dr. Tilley that he suffered seizures once a week. (R. 544.) Griffin had no obvious difficulty with word finding, grammar, syntax, pronunciation, fluency, usage, logic, or coherence. (R. 544-45.) Griffin did not require repetition, clarification, or simplification of any instructions. (R. 545.) His affect was described as stable and appropriate, and he was described as being "calm and composed" in demeanor. *Id.* Griffin's Wechsler Memory Scale-III (WMS-III) scores were borderline with respect to working memory and extremely low with respect to his general memory. (R. 546.) Dr. Tilley opined that Griffin met the diagnostic criteria for an amnestic disorder due to seizures. Griffin presented with memory impairment as manifested by impairment in the ability to learn new information or the inability to recall

previously learned information. Griffin's memory impairment is noted to cause significant impairment in his occupational functioning and to represent a significant decline from a previous level of functioning. Also, his memory disturbance does not occur exclusively during the course of a delirium or a dementia. In addition, Dr. Tilley found evidence from his medical history that Griffin's memory disturbance is attributable to the direct physiological consequence of his seizures. Dr. Tilley concluded that from a purely psychological perspective, Griffin is unemployable and his mental functional impairments are expected to last 12 months or longer. ( R. 549.)

Dr. Tilley also completed a Mental Functional Capacity Assessment. ( R. 551-52.) Dr. Tilley found Griffin was extremely limited in his ability to remember locations and work-like procedures. ( R. 551.) Dr. Tilley opined that Griffin was markedly limited in his ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. According to Dr. Tilley, Griffin was moderately limited in his abilities to carry out detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; respond appropriately to changes in the work setting; and set realistic goals. *Id.*

**<u>Administrative Law Judge's Findings.</u>** The administrative law judge found that:

16

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since December 31, 2007, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the severe impairment best described as epilepsy (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels with the exception that he is precluded from climbing ladders, ropes, and scaffolding; working at unprotected heights; and working around hazardous machinery. This residual functional capacity is consistent with the opinion of Dr. Drew (Exhibit 16F), and it is well-supported by the record as a whole.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on February 15, 1975 and was 32 years old, which is defined as a "younger individual," age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a "limited" eleventh grade education and he is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

( R. 13-22.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id*.  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**  Griffin argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge's finding that Griffin does not have a documented severe memory impairment is not supported by substantial evidence. (Doc.

13 at 11.)  Plaintiff contends that the administrative law judge selectively cited from the evidence of record, and essentially rejected the unrebutted evidence from treating as well as examining physicians that Griffin has a documented memory impairment which is supported by objective testing.

- The administrative law judge erred in rejecting the opinion of treating neur-ologist, Dr. Moore.  (*Id.* at 15.)  Plaintiff argues that Dr.  Moore's records document that Griffin's seizure disorder meets or at least equals the require-ments of listing 11.02.  (*Id.* at 17.)  Plaintiff also contends that the administrat-ive law judge committed reversible error in failing to even address listing 11.02 in his decision.  (*Id.* at 19.)  According to plaintiff, the administrative law judge's reasons for rejecting Dr.  Moore's opinions are not supported by sub-stantial evidence.  (*Id.* at 21.)

- The administrative law judge committed reversible error in evaluating the impact of plaintiff's seizures on his ability to work.  Plaintiff argues that the administrative law judge misstated the medical evidence in claiming that Griffin's seizures are controlled when taking his medication and that he refused to undergo brain surgery.  (*Id.* at 22.)

- The administrative law judge failed to sustain his burden of establishing that there is other work in the national economy that Griffin can perform.  (*Id.* at 23.)  Plaintiff argues that the administrative law judge's hypothetical question to the VE did not accurately portray Griffin's limitations because he failed to

include any mental limitations at all, despite objective evidence documenting a significant memory impairment.  (*Id.* at 23-24.)

**Analysis.**

Mental impairments. In support of his first Error, Plaintiff argues that the administrative law judge erred by failing to find that he has a severe memory impairment.

An impairment can be considered as not severe only if the impairment is a "slight abnormality" which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience.  *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 90 (6th Cir. 1985)(citation omitted); *see also, Bowen v. Yuckert,* 482 U.S. 137 (1987).  Generally, an administrative law judge does not commit error requiring automatic reversal of the Commissioner's decision and an immediate award of benefits when the administrative law judge finds a non-severe impairment and determines that a claimant has at least one other severe impairment and then goes on with the remaining steps in the disability evaluation.  *See, Pompa v.  Comm'r of Soc.  Sec.,* No.  02-2335, 73 Fed.  Appx. 801, 803, (6th Cir.  Aug. 11, 2003); *see also Maziarz v. Secretary of Health and Human Services,* 837 F.2d 240, 244 (6th Cir. 1987).  That is because the administrative law judge considers all impairments, including non-severe impairments, in determining residual functional capacity to perform work activities.  *Id.*

As noted above, the mental health care providers at Access Ohio Mental Health Center diagnosed Plaintiff with mental impairments which affected his ability to

perform work-related activities. ( R. 564-65.) In addition, when being evaluated by Dr.

Bornstein in October 2007, Dr. Bornstein found, *inter alia,* that testing demonstrated

Griffin's expressive vocabulary was well below average and his spatial reasoning was

in the borderline normal range and auditory working memory was moderately impair-

ed. ( R. 347-48.) Dr. Tilley noted in July 2012 that Griffin's memory impairment was

noted to cause significant impairment in his occupational functioning and represented a

significant decline from a previous level of functioning. Dr. Tilley also found that Grif-

fin's memory disturbance did not occur exclusively during the course of a delirium or a

dementia. In addition, Dr. Tilley found evidence from his medical history that his mem-

ory disturbance is attributable to the direct physiological consequence of his seizures.

Dr. Tilley concluded that from a purely psychological perspective, Griffin is unemploy-

able and his mental functional impairments are expected to last 12 months or longer. (R.

549.) Finally, Dr. Dubey, the state agency consultative examiner, reported that during

the examination Griffin demonstrated problems with attention and concentration

deficits. ( R. 353.) There is no suggestion in the record that Plaintiff does *not* have a

severe mental impairment.

     In spite of the significant amount of evidence of a severe mental impairment, the

administrative law judge failed to recognize the presence of a severe mental impairment

although he continued on through the sequential evaluation process to step 4, and in

the alternative to step 5, before concluding that Plaintiff is not disabled. However, in

determining Plaintiff's residual functional capacity, the administrative law judge failed

to consider any mental limitations whatsoever. Rather, the administrative law judge specifically considered only Plaintiff's exertional limitation. *See* R. 17, finding 5.

Under these facts, this Court cannot say that this matter falls within the parameters of *Maziarz*, supra.

Vocational expert's opinion. Although the administrative law judge's decision made a residual functional capacity finding, it did not include any limitations based on Griffin's sole severe impairment, epilepsy, other than restricting him from heights and hazardous machinery. At the administrative hearing, the administrative law judge asked the vocational expert to assume a claimant with plaintiff's vocational profile and a residual functional capacity to perform work at all exertional levels, but which does not involve exposure to moving machinery or unprotected heights. In response, the vocational expert testified that such a claimant could not perform plaintiff's past relevant work, but could generally perform factory based production work with a 30% - 40% reduction. ( R. 50.) The vocational expert testified to jobs such as general production worker, with 12,000 jobs in central Ohio, or production clerk and material handler with between 7,000 and 8,000 each in central Ohio. The vocational expert noted these jobs would be reduced by 30% - 40%. The vocational expert also testified that, if a claimant were off four or more days per month and unable to maintain concentration for two hour segments, it would preclude employment. ( R. 51.) The vocational expert testified that her testimony was consistent with the *Dictionary of Occupational Titles*. *Id.*

On this issue, the case law is clear that when a claimant suffers from a seizure disorder, the administrative law judge, in addition to restricting the claimant from performing certain hazardous activities which are inconsistent with occasional seizures, has an obligation to describe for the vocational expert the frequency, nature, and duration of plaintiff's seizures based upon the evidence of record. As one court has observed,

> The omission of any specific information about [plaintiff's] seizures from the administrative law judge's hypothetical questions - such as potential frequency, type of seizure activity, and any [after effects] found by the administrative law judge - undermines the vocational expert's testimony about jobs potentially available to [the plaintiff] and the administrative law judge's determination that she can engage in substantial gainful activity despite her seizure disorder.

*Tucker v. Barnhart*, 201 Fed. Appx. 617, *6 (10th Cir. 2006). Many other courts have imposed a similar requirement. *See Folsom v. Barnhart*, 309 F.Supp.2d 1286 (D. Kan. 2004); *Orr v. Chater*, 956 F.Supp. 861 (N.D. Iowa 1997); *see also Flanery v. Chater*, 112 F.3d 346, 350n.10 (8th Cir. 1997). Thus, a finding concerning substantial gainful activity can be considered erroneous if it is based upon a hypothetical question which essentially assumes that a claimant with a seizure disorder does not actually suffer from seizures. *See Torres v. Chater*, 78 F.3d 595 (9th Cir. 1996).

Here, as noted above, the hypothetical question posed to the vocational expert did not include any information about the frequency, duration, or after-effects of seizures. The administrative law judge appears to have concluded that because there was evidence that Griffin suffered three seizures in one day when he went off his

medications that he would not have any seizures if he just took his medications. However, the administrative law judge is not a doctor, and there is no medical opinion evidence in the record supporting that assumption. To the contrary, Dr. Moore, Griffin's long-time treating specialist, repeatedly stated that he suffered from intractable epilepsy. Dr. Moore's reports do not indicate that Griffin's seizures occur due to his failure to take prescribed medication. And there is a long history of seizures that continued through the date of decision. Even so, the administrative law judge was not required to fully credit Griffin's reports of the frequency and duration of his seizures if other medical evidence supported his findings. For example, the administrative law judge could consider Griffin's decision not to undergo surgery as evidence that the seizures did not interfere with his daily life functioning to the extent he testified.

Nonetheless, the administrative law judge could not, without supporting medical evidence, determine that all of Griffin's seizures were caused by his failure to take prescribed medication based on one incident in 2010 when emergency room doctors "felt" that his three seizures on the day of admission were caused my noncompliance. Griffin had never previously reported multiple seizures on one day. Instead, he reported one to four complex partial seizures a month and relatively frequent headaches. His treators' notes do not question the frequency of the seizures. Indeed, it seems unlikely Dr. Moore would have recommended surgery if he believed the seizures could be controlled by medication.

Here, the administrative law judge believed that noncompliance explained Griffin's seizures. Since there was no medical evidence in the record supporting that conclusion, he should have contacted Griffin's treating physicians "to determine whether the additional information we need is readily available."  20 C.F.R. §404.1512(e)(1).  The Commissioner "will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  *Id.*

If the information readily available from the treators does not resolve the administrative law judge's questions about whether noncompliance with taking prescribed medications causes the continuing seizures, he should consider requesting a consultative examination by one of the treators. 20 C.F.R. §404.1512(f). (When the needed information "is not readily available from the records of your medical treatment source, or we are unable to seek clarification from your medical treatment source, we will seek you to attend one or more consultative examinations at our expense.")

For the reasons set out above, I conclude that there is not substantial evidence in the record supporting the administrative law judge's residual functional capacity determination because there is no medical evidence supporting his conclusion that all of Griffin's seizures are caused by medication noncompliance.

Because of the need for remand of this case, an in-depth of analysis of plaintiff's remaining two contentions is unwarranted. On remand the administrative law judge

may, if he so chooses, consider the need for any further deliberation or explanation regarding plaintiff's complaints of Dr. Moore's opinion and Listing 11.02. Nevertheless, the undersigned reaches no conclusion on these issues.

**Conclusions.** For the reasons set forth above, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **REMANDED** to properly evaluate Griffin's memory impairment and the vocation expert testimony.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).


       s/Mark R. Abel             
       United States Magistrate Judge